UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> EVANN HERRELL, MARK GRENKOSKI, ) <br> KERI MCFARLANE, and STEPHEN ) <br> CIRELLI, ) <br> ) <br> Defendants. ) | Criminal No. 6:21-cr-00013-GFVT <br><br> **MEMORANDUM OPINION** <br> **&** <br> **ORDER** |

*** *** *** ***

At the close of the government's proof, all Defendants moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). [R. 728.] On July 31, 2023, the Court denied the Motions from the bench. It indicated that a written order would follow explaining its reasoning. Additional grounds for the Court's ruling denying the Rule 29 motions are set out herein.

**I**

The Defendants were indicted on March 4, 2021 with conspiracies to unlawfully dispense controlled substances, cause the submission of fraudulent claims in connection with health care benefit programs, and commit money laundering under §1967 and § 1957. [R. 1.] The Defendants were all also charged with direct money laundering offenses under §1967 and § 1957. *Id.* at 23-30. Defendants Herrell, Grenkoski, and McFarlane were also charged with conspiracies to commit wire and health care fraud. *Id.* at 13-19.

Over more than eighteen days of trial spanning seven weeks and forty witnesses, the Government presented evidence seeking to prove that the care the Defendants provided at EHC

was not legitimate. It focused on the patient records' reflection of the prescriptions issued to the patients and the surrounding circumstances, recorded undercover visits with EHC physicians, and testimony by employees and patients about the practice at EHC. The Defendants claim that this evidence is insufficient to convict them and seek acquittal on all charges. [*See* R. 728; *see generally* Tr. [1]] The Court denied the Motions from the bench on July 31, 2023, indicating that a written Order would follow. The Defendants renewed their Motions for Acquittal at the close of the defense case on August 9, 2023. The Court again denied the Motions, incorporating its prior reasoning as stated on the record and this Order.

## II

Rule 29 requires this Court to enter a judgment of acquittal on "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Court views the evidence in the light most favorable to the Government, and then it considers whether any rational trier of fact could find the elements of the counts of conviction beyond a reasonable doubt. *See, e.g.*, *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016); *United States v. Villarce*, 323 F.3d 435, 438 (6th Cir. 2003). "In sum, a defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015) (quoting *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007)).

### A

A reasonable jury could find the Defendants guilty of Count 1, conspiring to unlawfully dispense controlled substances. "[I]n order to establish a drug conspiracy in violation of 21 U.S.C. § 846, 'the government must prove, beyond a reasonable doubt, (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the

---

[1] Citations to the transcript are to a rough draft of the transcript of the hearing held on July 28, 2023. A final version of the transcript will be filed in the record.

conspiracy.'" *United States v. Powell*, 847 F.3d 760, 780 (6th Cir. 2017) (quoting *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999)); *see also* 21 U.S.C. § 846, [R. 1 at 7-8]. The Supreme Court recently clarified that convictions of physicians under the Controlled Substances Act require that the defendant knew that their conduct was unauthorized. *United States v. Ruan*, 142 S. Ct. 2370, 2376 (2022). Accordingly, the Defendant must know that the distribution which the parties to the conspiracy agreed to conduct was unauthorized. *See United States v. Mencia*, No. 18-13967, 2022 WL 17336503, at *8 (11th Cir. Nov. 30, 2022). A tacit agreement or mutual understanding is sufficient to establish a conspiracy. *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998).

In the light most favorable to the Government, the evidence shows that the physicians at EHC, including the Defendants, conspired to issue unauthorized prescriptions. Many EHC employees and patients testified that the physicians frequently prescribed high doses of buprenorphine, often in combination with benzodiazepines, without eventually tapering their patients down to progressively lower doses. Numerous signs suggest that these prescriptions were not issued for a legitimate medical purpose. For example, the patient records reflect that these prescribing practices continued despite numerous failed drug screens, reports of diversion, and blatant signs of diversion. [*See, e.g.*, Gov. Ex. 1006, 1088, 1102.] "High volumes and dangerous combinations of controlled substances" can support a conspiracy to unlawfully dispense controlled substances, as can failing to respond to negative drug screens. *See United States v. Campbell*, No. 3:17-cr-87-RGJ, 2021 WL 4142676, at *2-7 (W.D. Ky. Sept. 10, 2021). Other elements of EHC's practice suggesting a conspiracy to issue unlawful prescriptions include not taking insurance and patients travelling from far distances and arriving in groups. *See United States v. Gowder*, 841 Fed. App'x 770, 778 (6th Cir. 2020).

The length of the Defendants' patients visits could also reasonably lead to an inference that the physicians' evaluations were not within the usual course of professional practice, making the resulting prescriptions unauthorized. Recorded undercover visits with Defendants Herrell and Cirelli demonstrate cursory visits with little evaluation or meaningful interaction regarding the patients' treatment. [Gov. Ex. 102B; Gov. Ex. 112B; *see also* Gov. Ex. 140A (summarizing the length of recorded visits with Defendant Herrell, which spanned 45-420 *seconds*).] Co-defendants Rasberry and Bidawid testified that EHC expected its physicians to see patients quickly to maximize patient volume. Further, EHC's fee structure incentivized this behavior. All physicians were paid per patient and Defendants Herrell, Grenkoski, and McFarlane each also received "pool pay." [*See* Gov. Ex. 350.] Accordingly, physician pay was correlated to the number of patients they were able to see.

The Sixth Circuit has held that a jury could reasonably infer knowing involvement in a § 846 conspiracy when a physician "performed extremely cursory medical examinations before prescribing large quantities of drugs." *United States v. Gowder*, 841 Fed. App'x 770, 778 (6th Cir. 2020). Here, the jury heard evidence of each of the Defendants performing very brief patient visits and prescribing high doses of buprenorphine and benzodiazepines. Like in *Gowder*, this is exacerbated by expert testimony that the Defendants engaged in illegitimate prescribing practices. [*See id.* ("Moreover, Dr. Eason, an expert witness on pain management, testified that every single file he reviewed—30 randomly selected, 12 chosen by the Government—showed illegitimate prescribing practices, with amounts and combinations of drugs that served no legitimate medical purpose."); R. 732 at 197-98 (Dr. Jorrisch's conclusion that the Defendants' practices were consistent and did not adhere to generally accepted standards).]

Numerous other elements of EHC's practice could contribute to a reasonable jury's conclusion that its physicians were engaged in a conspiracy to issue unlawful prescriptions. EHC charged its patients cash and did not take insurance. Operating a clinic without accepting insurance can contribute to a conclusion that the clinic was being used to illegally distribute controlled substances. *United States v. Hofstetter*, 31 F.4th 396, 419 (6th Cir. 2022) (not taking insurance supported conviction for knowingly maintaining a clinic for the purpose of illegally issuing prescriptions), *vacated in response to United States v. Ruan*, *Hofstetter v. United States*, 143 S. Ct. 351 (Mem.) (2022). The clinic utilized this model even though many of its patients struggled to afford their visits. The Defendants had reason to know this because of the drastically higher patient volume early in the month, when patients received their government benefits. [*See* R. 602A.] Numerous witnesses testified that it was well known around the clinic that its patients were low-income. Testimony and records also established that patients frequently travelled from far distances and many arrived in groups, which the Sixth Circuit has found can contribute to a jury finding a Controlled Substances Act conspiracy. *Gowder*, 841 Fed. App'x at 778.

Ultimately, there is sufficient evidence for the jury to convict the Defendants on Count 1. Many of the red flags exhibited at the clinic could lead a reasonable jury to conclude that the Defendants were knowingly participating in a conspiracy to dispense controlled substances which they knew were unauthorized. The Sixth Circuit indicated that red flags including not taking insurance, patients travelling from far distances and arriving in groups, not responding to the results of urine drug screens, and paying physicians per patient can all contribute to a conclusion that the physicians conspired to distribute controlled substances. *Gowder*, 841 Fed.

App'x at 778.  The Government admitted proof of those factors and more in the instant case, which contribute to the evidence sufficient for a reasonable jury to convict on Count 1.

The Defendants' primary argument in favor of acquittal on Count 1 is that the Government's expert, Dr. Jorrisch, applied the wrong standard to determine whether their prescribing was unlawful.  [*See* Tr. at 1, 17, 26, 35.]  Defendant Cirelli describes Dr. Jorrisch's testimony as applying an "ivory tower" standard, while others described it as "absolute best care."  [Tr. at 35, 2.]  This misrepresents the testimony.  On direct examination, Dr. Jorrisch frequently testified to the application of "generally accepted standards" to the Defendants' conduct.  [R. 732 at 89, 101, 112.]  His ultimate conclusion was that the "consistent pattern of practice" at EHC did not adhere to the "generally accepted standards" at the time.  *Id.* at 197.  On cross-examination, he was asked, "[a]nd you're not testifying that care has to be the absolute best practice to meet the standard of care, are you?"  [R. 733 at 33.]  He responded, "I disagree with that. I think that care needs to be the absolute best care, if that is the intention."  *Id.*  He then clarified that he believes that physicians should *intend* to provide the best care that they are able.  *Id.*  His testimony collectively makes clear that he evaluated EHC's practices under generally accepted medical practices at the time the care was provided.  [*See* Tr. Jorrisch Re-direct at 6-7, 22-23.[2]]  Under that standard, he concluded that the practices at EHC, including the Defendants' practices, were insufficient.  *See id*.  A reasonable jury could believe Dr. Jorrisch's testimony and convict the Defendants on Count 1.

The Defendants' other arguments for acquittal are similarly unavailing.  They attempt to distinguish between the actions of office staff and themselves.  [Tr. at 20; *see also id.* at 28, 36.]  For example, Defendants Grenkoski and Cirelli argue that that they were not involved in many of

---

[2] Citation is to a rough draft of the transcript of Dr. Jorrisch's re-direct examination on July 26, 2023.  A final version of the transcript will be filed in the record.

6

the communications admitted to establish the conspiracy. *Id.* at 20, 36. But they need not be. The agreement can be tacit, rather than explicit, and the Government can use circumstantial evidence to prove it. *United States v. Hamm*, 952 F.3d 728, 736 (6th Cir. 2020) (citing *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999)). Accordingly, communications about the agreement are not required. As explained above, there is sufficient evidence for a reasonable jury to convict each of the Defendants on Count 1, even without evidence of communications about the agreement.

Defendant Grenkoski claims that he is differently situated because there are no recorded undercover interactions with him. [Tr. at 16-17.] Such interactions are not necessary because other sufficient evidence exists to support his conviction. And Defendants Rasberry and Bidawid testified that the other EHC physicians practiced in the manner demonstrated in the recorded undercover visits. Viewing this evidence in the light most favorable to the Government, a reasonable jury could conclude that Dr. Grenkoski participated in the conspiracy.

Defendant McFarlane asserts that she was also differently situated and always intended to provide good care to her patients. [Tr. at 27.] She claims she took time with her patients, but the proof shows that she saw between fifty and eighty-nine patients on twenty-seven days during her time working at EHC. [Gov. Ex. 602A at 7.] A reasonable jury could conclude that this high volume, in combination with other elements of her practice, falls below the usual course of professional practice.

Throughout trial, McFarlane has also emphasized that she is differently situated because many of the referenced guidelines were established after she left the clinic. [Tr. at 32.] But her counsel agreed that there was nevertheless an existing standard of care at the time. *Id.* McFarlane had sufficient opportunity throughout trial to emphasize that any post-2016 guideline

7

would not apply to her practice. And the Government offered sufficient evidence about the standard of care during McFarlane's time at EHC to allow a reasonable jury to convict her.

Dr. Cirelli suggests he had no access to Salesforce and that there is a lack of communications between himself and others at EHC about the clinic's operation. [Tr. at 36.] Again, evidence of direct communications about the agreement are not required to prove a conspiracy. *See Hamm*, 952 F.3d at 736. And even if physicians couldn't access all parts of the Salesforce patient records, there would be sufficient evidence to convict Cirelli. A recorded video demonstrates a cursory visit he had with a patient and the Government admitted plentiful evidence of improper prescribing. [Gov. Ex. 112B.] Again, Rasberry and Bidawid testified that these practices were widespread amongst the physicians and were an expected element of practice at EHC. Sufficient evidence exists to convict Cirelli on Count 1.

**B**

A reasonable jury could also find the Defendants guilty of Count 3, a conspiracy to cause the submission of false statements or documents in connection with health care benefit programs. [*See* R. 1 at 8-12.] Co-defendants Rasberry and Bidawid testified that EHC physicians, including each of the Defendants, misrepresented patients as pain, rather than addiction, patients in order to prescribe buprenorphine to more patients than the DEA permitted. They testified that this distinction was an artifice. An email from Lori Barnett to Robert Taylor, titled "Suboxone: Loopholes and Definitions," frames the pain versus addiction distinction as a method to "surpass" DEA limitations on prescribing Suboxone. [Gov. Ex. 1863.] In combination with Defendants Rasberry and Bidawid's testimony and the patient records, a reasonable jury could infer that the Defendants were misrepresenting their treatment. A reasonable jury could

8

conclude that this documentation constituted material misrepresentations designed to obtain Medicaid or Medicare reimbursement.

The Defendants emphasize that this is not a standard false claims allegation because they did not directly submit any statements or documents to a health care benefit program. [*See* Tr. at 8.] They suggest that others, such as American Toxicology employees or administrative staff at EHC, are responsible for any false statements or documents because they were the individuals who submitted the claims to health care benefit programs. *Id.*

The Defendants are not charged with directly submitting false statements or documents in connection with health care benefit programs. They are charged with participating in a conspiracy to do so. A defendant is not required to achieve the object of the conspiracy to be convicted. *United States v. Schaffer*, 586 F.3d 414, 422-23 (6th Cir. 2001). The conspiracy at EHC "could not have functioned without" the Defendants because without a physician seeing the patient and ordering prescriptions and urine drug screens, there was nothing to submit to the health care benefit programs. *United States v. Meda*, 812 F.3d 502, 514 (6th Cir. 2015). Because there is sufficient evidence to conclude that the claims were premised on material misrepresentations by the Defendants, there is sufficient evidence for a reasonable jury to convict the Defendants on Count 3.

C

For the same reasons, sufficient evidence exists for the jury to find Defendants Herrell, Grenkoski, and McFarlane guilty of conspiracies to commit wire fraud and health care fraud. Count 4 is premised on conspiracies to commit wire and health care fraud by causing the submission of fraudulent claims for reimbursement of prescriptions for buprenorphine, benzodiazepines, and gabapentin. [R. 1 at 13-16.] The Government's theory underlying this

claim is focused on the submission of prior authorizations for prescriptions. [*See* Tr. at 51, 55.] It admitted evidence about multiple misrepresentations underlying these authorizations, like the chronic pain versus addiction artifice, that the patients would be tapered down, and that there would be random urine drug screens and random pill counts. [*See* Tr. at 50-51.] Further, the physicians regularly engaged in physician swapping, in which a Medicaid approved physician would sign off on a prescription for a patient whom they did not see. Witnesses testified that the new physician did not consult with the treating physician before signing off on the prescription. A reasonable jury could therefore conclude that the authorizations included materially false misrepresentations.

Count 5 is premised on conspiracies to commit wire and health care fraud by causing the submission of fraudulent claims for reimbursement of urine drug screens. [R. 1 at 16-19.] The Government's theory is that the physicians were not submitting "individual orders," but rather "went along with a standing order practice." [Tr. at 55.] Further, a reasonable jury could conclude that the drug screens were not being used in the usual course of professional practice because unexpected results were rarely followed with meaningful action in the patients' treatment plans. Accordingly, there is sufficient evidence for a reasonable jury to convict Defendants Herrell, Grenkoski, and McFarlane of Counts 4 and 5.

### D

Having concluded that there is sufficient evidence to support convictions for the above conspiracies, there is also sufficient evidence to support convictions on the substantive and conspiracy money laundering charges. These charges are premised on the Defendants' receipt of their paychecks from EHC. [*See* R. 1 at 19-32.] The Government admitted evidence, including

10

bank and payroll records, of payments from EHC to the Defendants. [*See* Gov. Exs. 912, 915, 920, 921b; *see also* 922 (summary chart of payments).]

Count 6 charges a conspiracy to violate 18 U.S.C. § 1956(a)(1)(A)(i) by engaging in financial transactions involving funds which the Defendants knew were the proceeds of unlawful activity. [R. 1 at 19-20.] The Defendants are charged in Counts 14, 16, 18, and 23 with substantively violating that provision. *Id.* at 24-30. As explained above, a reasonable jury could find that the Defendants knowingly engaged in unlawful conduct while practicing at EHC. As a result, a reasonable jury could also conclude that they knew that their paychecks from EHC constituted the proceeds of that unlawful activity. The evidence shows that Defendants agreed to engage in these transactions with Robert Taylor because he was the owner of EHC, which sent the payments. Accordingly, a reasonable jury could also convict the Defendants of the conspiracy charges, Counts 6, 14, 16, 18, and 23.

Count 7 charges a conspiracy to violate 18 U.S.C. § 1957 by knowingly engaging in financial transactions with criminally derived property valued at more than $10,000. [R. 1 at 20-21.] Counts 13, 15, 17, 19, and 22 charge substantive violations of this provision. *Id.* at 24-30. For the reasons explained above, a reasonable jury could conclude that Defendants engaged in the transactions knowing that they involved criminally derived property. The bank and payroll records show numerous transactions exceeding $10,000. [*See* Gov. Exs. 912, 915, 920, 921b; *see also* Gov. Ex. 922 (summary chart of payments).]

Dr. Grenkoski argues that he did not receive funds from Medicare or Medicaid or that he directly received cash payments from patients. [Tr. at 23-24.] The Government is not claiming that the money laundering charges are based on such transactions. Rather, they are charged with conducting financial transactions involving the *proceeds* of unlawful activity or criminally

11

derived property.  [R. 1 at 24-30.]  There is no requirement that transactions come from Medicare or Medicaid or that EHC could not transfer cash into wired funds.  Even without the transfers referenced by Grenkoski, there is sufficient evidence for a reasonable jury to convict him and the other Defendants on the money laundering charges.

### III

This is not the rare case where acquittal under Rule 29 is warranted.  In the light most favorable to the Government, a reasonable jury could convict the Defendants of all of the charges laid against them.  For the reasons stated herein and the reasons stated on the record, the Defendants' Motions for Acquittal under Federal Rule of Criminal Procedure 29(a) **[R. 728]** and their renewed Motions as raised on August 9, 2023 are **DENIED**.

This the 9th day of August, 2023.

Gregory F. Van Tatenhove
United States District Judge