UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 6:21-cr-00013-GFVT |
| | ) | |
| v. | ) | |
| | ) | |
| EVANN HERRELL, MARK GRENKOSKI, | ) | **MEMORANDUM OPINION** |
| KERI MCFARLANE, and STEPHEN | ) | **&** |
| CIRELLI,** | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the United States's motion seeking admission of co-conspirators' out of court statements under Federal Rule of Evidence 801(d)(2)(E).  [*See* R. 728.] By prior Order, the Court elected to conditionally admit these statements subject to a future *Enright* finding.  [R. 502 at 3-5.]  At the close of the Government's case in chief, the Defendants renewed their objection to admission of the statements and argued that the Government did not meet its burden under *Enright*.  [Tr. at 1-2.[1]]  They orally objected to admission of the co-conspirator statements, while the Government orally moved the Court to find *Enright* satisfied. [*See generally id.*; R. 728.]  On July 31, 2023, the Court ruled from the bench that the Government satisfied its burden, granted the Government's Motion for *Enright* finding, and overruled the Defendants' objections.  It indicated that a written order would follow explaining its reasoning.

---

[1] Citations to the transcript are to a rough draft of the transcript of the hearing held on July 28, 2023.  A final version of the transcript will be filed in the record.

**I**

The Indictment charges the Defendants with numerous offenses arising from their employment at EHC Medical Offices.  [R. 1.]  Each of the Defendants who proceeded to trial was a physician at EHC.  *Id.* at 6-7.  The Government's overarching allegation is that EHC was a putative pain clinic which "frequently prescribed high doses of Suboxone (buprenorphine/naloxone), Klonopin (clonazepam), and Neurontin (gabapentin)," often in the face of numerous failed drug screens and signs of diversion.  [R. 725 at 2.]  As a result, the Government believes that the Defendants engaged in conspiracies to unlawfully dispense controlled substances, make materially false statements in connection with health care benefit programs, and commit money laundering.  [*See generally* R. 1.]  It also alleges direct money laundering offenses under 18 U.S.C. §§ 1956 and 1957.  *Id.* at 23-30.  Finally, it alleges that Defendants Herrell, Grenkoski, and McFarlane participated in conspiracies to commit wire fraud and health care fraud by their involvement in the submission of false claims for reimbursement for prescriptions and urine drug screens.  *Id.* at 13-19.

**II**

Federal Rule of Evidence 801(d)(2)(e) advises that statements which would otherwise constitute hearsay are not hearsay if they are "offered against an opposing party and [were] made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. 801(d)(2)(e). In *United States v. Enright*, the Sixth Circuit established a test for admitting a co-conspirator's out of court statement pursuant to Rule 801.  *See generally United States v. Enright*, 579 F.2d 980 (6th Cir. 1978).  In order to admit evidence under Rule 801(d)(2)(e), the district court must make the requisite *Enright* findings, namely: "(1) that the conspiracy existed; (2) that the defendant was a member of the conspiracy; and (3) that the co-conspirator's statements were

2

made in furtherance of the conspiracy." *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999) (citing *United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997)).  These elements need only be proven by a preponderance of the evidence.  *Enright*, 579 F.2d at 986.  The Court may consider the objected-to statements themselves in determining the ultimate question of admissibility.  *See United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979).

*Vinson* established three options for admitting co-conspirator statements: requiring the Government to first establish the conspiracy at trial before admitting the statements, conducting a mini-hearing before trial, or conditional admission subject to a later *Enright* finding.  *Id.* at 153.  The Court utilized the third approach and provisionally admitted the co-conspirator hearsay statements, subject to a subsequent *Enright* finding.  [R. 502 at 3-5.]

The United States concluded its case in chief on Thursday, July 27, 2023.  [R. 727.]  The Defendants maintained their objections to the admission of co-conspirator statements throughout trial and renewed their objections at a hearing held outside the jury's presence after the conclusion of the Government's case in chief.  [Tr. at 1-2; R. 728.]  Before this hearing, at the Court's direction, the Government submitted a memorandum outlining the evidence which it believes establishes a conspiracy under Rule 801(d)(2)(E).  [R. 725.]  After examining the Government's filing and considering its case in chief and the parties' arguments, the Court finds that the preponderance of the evidence supports a finding, "(1) that the conspiracy existed; (2) that the defendants were members of the conspiracy; and (3) that the co-conspirators' statements were made in furtherance of the conspiracy."  *Wilson*, 168 F.3d at 920.

### A

First, the preponderance of the evidence establishes a conspiracy to unlawfully dispense controlled substances.  This first finding tracks the first element of a conspiracy to dispense

3

controlled substances: an agreement to unlawfully dispense controlled substances. *United States v. Powell*, 847 F.3d 760, 780 (6th Cir. 2017). The Court focuses on this conspiracy, charged in Count 1, because the Government and the Defendants all used it to frame their arguments for and against the *Enright* finding. [*See, e.g.*, Tr. at 3 ("Everything flows in our view from the Count 1 as to the conspiracy that has to be established."), 18, 27, 36; R. 725 at 2 n.1.] The Government is not required to prove any particular charged conspiracy to admit co-conspirator statements. *United States v. Musaibli*, 42 F.4th 603, 615 (6th Cir. 2022). "In fact, there need not even be a conspiracy charge in the case for Rule 801(d)(2)(E) to apply." *Id.* The Sixth Circuit emphasizes that "the key is coordinated action." *Id.* Nevertheless, the charged conspiracy is often "instructive to the analysis under Rule 801(d)(2)(E)." *Id.*

The preponderance of the evidence shows an overarching scheme at EHC to prescribe controlled substances not for a legitimate medical purpose and outside the course of usual professional practice. Many EHC employees and patients testified that the physicians, including the Defendants, frequently prescribed high doses of buprenorphine, often in combination with benzodiazepines, without eventually tapering their patients down to progressively lower doses. Numerous signs suggest that these prescriptions were not issued for a legitimate medical purpose. For example, the patient records reflect that these prescribing practices continued despite numerous failed drug screens, reports of diversion, and blatant signs of diversion. [*See, e.g.*, Gov. Ex. 1102.] "High volumes and dangerous combinations of controlled substances" can support a conspiracy to unlawfully dispense controlled substances, as can failing to respond to negative drug screens. *See United States v. Campbell*, No. 3:17-cr-87-RGJ, 2021 WL 4142676, at *2-7 (W.D. Ky. Sept. 10, 2021).

4

Testimony and exhibits also show that the Defendants frequently saw patient volumes so high that their patient evaluations were too brief to have provided adequate medical evaluation. [*See* Gov. Ex. 602; 602A at 6-9.]  Recorded undercover visits with Defendants Herrell and Cirelli demonstrate these cursory visits.  [Gov. Ex. 102B; Gov. Ex. 112B; *see also* Gov. Ex. 140A (summarizing the length of recorded visits with Defendant Herrell, which spanned 45-420 *seconds*).]  EHC's pay structure incentivized this behavior.  All physicians were paid per patient and Defendants Herrell, Grenkoski, and McFarlane each also received "pool pay."  [*See* Gov. Ex. 350.]  EHC also did not take insurance although many of its patients struggled to afford their visits without assistance.  The Defendants had reason to know of their patients' financial status because of the drastically higher patient volume early in the month when patients received their government benefits.  [*See* R. 602.]

The preponderance of the evidence also shows a related agreement between the Defendants and others to misrepresent patients' treatment.  Co-defendant Rasberry testified that EHC physicians, including the Defendants, misrepresented patients as receiving buprenorphine for pain, rather than addiction, to exceed their DEA waiver limitations.  This is corroborated in a medical record showing that one of Dr. McFarlane's patients was switched from a chronic pain to an addiction diagnosis with little explanation.  [*See, e.g.*, Gov. Ex. 1102 at 78-79.]  Co-defendant Rasberry testified that this distinction was an artifice.  An email from Lori Barnett to Robert Taylor with the subject "Suboxone: Loopholes and Definitions" corroborates this.  [Gov. Ex. 1863.]  The body of the email states "[t]he loop hole for managing pain with Suboxone (Thus being able to surpass the '30 or 100 count')."  *Id.*  Attached to the email was a communication from a DEA agent discussing the bounds of the DATA limitation.  *Id.*  Though none of the Defendants were a recipient of that email, it demonstrates that EHC management

5

viewed the prescription of buprenorphine for pain as a loophole to surpass the DEA's limitations. *Id.* The Defendants then engaged in this practice in the course of their employment at EHC.

The Defendants' arguments that the preponderance of the evidence does not establish a conspiracy are unavailing. First, they each relied heavily on discrediting the Government's expert witness, Dr. Jorrisch. [*See* Tr. at 1, 17, 26, 35.] Defendant Cirelli describes his testimony as applying an "ivory tower" standard, while others described it as "absolute best care," arguing his standard is significantly higher than the legal requirement that physicians prescribe for a legitimate medical purpose in the usual course of professional practice. [Tr. at 35, 2.] This misrepresents the testimony. On direct examination, Dr. Jorrisch frequently testified to the application of "generally accepted standards" to the Defendants' conduct. [R. 732 at 89, 101, 112.] His ultimate conclusion was that the "consistent pattern of practice" at EHC did not adhere to the "generally accepted standards" at the time. *Id.* at 197. On cross-examination, he was asked, "[a]nd you're not testifying that care has to be the absolute best practice to meet the standard of care, are you?" [R. 733 at 33.] He responded, "I disagree with that. I think that care needs to be the absolute best care, if that is the intention." *Id.* He then clarified that he believes that physicians should *intend* to provide the best care that they are able. *Id.* His testimony collectively makes clear that he evaluated EHC's practices under generally accepted medical practices at the time the care was provided. [*See* Tr. Jorrisch Re-direct at 6-7, 22-23.] Under that standard, he concluded that the practices at EHC, including the Defendants' practices, were insufficient. *See id*.

The Defendants also argue that no evidence establishes their knowing participation in the submission of false statements or documents to health care benefit programs. [*See, e.g.*, Tr. at 4.] They emphasize that the Defendants themselves did not submit claims for reimbursement of

6

either prescriptions or urine drug screens. *Id.* This is not required. Rather, they participated in a conspiracy to do so. This is demonstrated in part by the conduct referenced above. While the Defendants did not submit claims to health care benefit programs, the preponderance of the evidence shows that they provided insufficient medical care. As a result, the reimbursement claims based on that care were not medically necessary and were not appropriate for reimbursement. Although others may have submitted the claims, the scheme "could not have functioned without" the Defendants. *United States v. Meda*, 812 F.3d 502, 514 (6th Cir. 2015).

The preponderance of the evidence shows at least a "tacit understanding" amongst the physicians at EHC to collectively engage in these prescribing and reporting practices. *See United States v. Harrison*, 663 Fed. App'x 460, 464 (6th Cir. 2016). ("A finding of conspiracy does not require proof of formal agreement; a mere tacit understanding among the participants is sufficient."). Co-defendants Bidawid and Rasberry testified that the practices at EHC were a result of an understanding across EHC that physicians were expected to practice in this manner. The Defendants provided cursory visits and continued to see patients after numerous failed drug screens and reports of diversion, which allowed EHC to maximize its patient volume. The consistency of practice among the physicians demonstrates an agreement to practice in this manner. Ultimately, the preponderance of the evidence shows that this conduct was "coordinated action" to provide illegitimate medical care. *Musaibli*, 42 F.4th at 615. Therefore, Government satisfied its burden on the first *Enright* inquiry and the Court finds that a conspiracy to violate the drug laws existed at EHC.

**B**

Second, the preponderance of the evidence shows that each of the Defendants were members of the conspiracy. This finding mirrors the conspiracy elements requiring knowing and

voluntary participation in the agreement.  *See Powell*, 847 F.3d 760, 780.  As the Government asserts, "[t]he Defendants each worked at EHC for several years, giving them ample time to both observe the signs that EHC was supplying illegitimate prescriptions for drugs that would be diverted and to actively participate in the drug conspiracy . . ."  [R. 725 at 7.]  Specifically, the preponderance of the evidence shows that the Defendants participated in the conspiracy by continuing to work at EHC after these signs were evident and by issuing unlawful prescriptions themselves.  The Government submitted evidence that each Defendant individually prescribed high doses of buprenorphine without eventually tapering the patient, often in combination with benzodiazepines, with rare consequences for failed drug screens or reports of diversion.  [*See, e.g.*, Gov. Ex. 1102; Gov. Ex. 1056.]

The Government emphasizes misrepresentations made by each defendant in recorded interviews with law enforcement to further demonstrate their involvement in the conspiracy.  [Gov. Ex's. 801, 803, 805a-d, 806.]  These statements regarding their prescribing practices and time spent with patients—which the medical records contradict—demonstrate consciousness of guilt.  Similarly, they each misrepresented the extent of the treatment they provided in patients' records in part by recording examinations and discussions that did not occur.  Had the Defendants genuinely believed that their practice was proper, their statements to law enforcement and the medical records would have accurately reflected the treatment they gave patients.  Evidence exhibiting a consciousness of guilt weighs in favor of finding the speaker to be a member of a conspiracy.  *See United States v. Lopez-Medina*, 461 F.3d 724, 748 (6th Cir. 2006).

Evidence beyond the Defendants' continued employment at EHC, individual prescribing practices, and misrepresentations further ties each Defendant to the conspiracy at EHC.

8

Defendant Herrell's involvement in the conspiracy is evident in his frequent use of the term "Team Taylor" in communications about EHC's operation. [*See* Gov. Ex. 701.] At one point, he stated "anything for Team Taylor." *Id.* at 10. He also saw some of the highest patient volumes at EHC, seeing more than fifty patients per day on eighty-four days. [Gov. Ex. 602A at 6.] And Herrell was not just a physician practicing at the clinic. He was Medical Director of the Jacksboro clinic, second only to Robert Taylor in the organizational chart. [R. 315 at 23-24.] Accordingly, he had a greater role at the clinic which ties him even more closely to the conspiracy. The preponderance of the evidence shows that he was a member of the conspiracy.

Defendant Grenkoski was also a member of the conspiracy, as he engaged in the same prescribing practices seen across the physicians. Dr. Grenkoski emphasizes a lack of direct interaction with individuals he claims are more closely connected to the allegedly unlawful conduct. [*See, e.g.*, Tr. at 22.] For example, he claims that there is no communication between him and Lori Barnett or Michael Dube, owner of American Toxicology. *Id.* But again, the Government admitted evidence of Defendant Grenkoski himself performing insufficient evaluations, prescribing in improper doses, ignoring failed drug screens, and not tapering patients. [*See generally* Gov. Ex. 1111; R. 732 at 58-60.] Like Herrell, Grenkoski was the Medical Director at the Harriman clinic. He has the same supervisory and managerial roles that connect him even more closely to the conspiracy at EHC.

Defendants McFarlane and Cirelli also participated in the conspiracy by issuing prescriptions in the manner expected at EHC: high buprenorphine dosages, frequently in combination with benzodiazepines, without consequence for failed drug screens or signs of diversion. Additionally, Defendant McFarlane explicitly stated her knowing participation in an interview with law enforcement. She recognized that EHC was functioning as a "pill mill" in

9

2015.  [Gov. Ex. 801.]  Nevertheless, she continued working there until October 2016.  This is clear evidence that she participated in the clinic's practices knowing that they were unlawful, hence her use of the term "pill mill."  *Id.*

Defendant McFarlane asserts that she is situated differently from the other defendants because she left in late 2016.  [*See* Tr. at 28.]  She also emphasizes that her name was used on prescriptions until 2019, years after she left the practice.  *Id.*  She claims this shows that other employees were hiding their unlawful conduct from her.  [*See* Tr. at 29.]  But Defendant McFarlane's own practice before she left is sufficient to tie her to the conspiracy.  She treated exceptionally high numbers of patients and prescribed them buprenorphine with benzodiazepines, frequently in high doses without eventual tapers.  Throughout her interview, she explains that she knew that the practice at EHC was illegitimate.  [Gov. Ex. 801.]  By continuing to work for EHC, she knowingly acquiesced to this practice.  That at least shows a tacit agreement.

Each of the Defendants acted in the manner expected at EHC, despite blatant signs that those expectations were improper.  The Defendants all exhibit consciousness of their guilt through disconnects between their actual practice and how they represented it to third parties. The Sixth Circuit has found that evidence of "excessive prescriptions with little information about each patient" supports a finding that the physician was involved in a conspiracy to violate the drug laws, especially when supported by expert testimony that the prescriptions were illegitimate.  *See Gowder*, 841 Fed. App'x 778.  The preponderance of the evidence shows that the Defendants each issued excessive prescriptions and conducted cursory visits and the Government's expert concluded that their practices fell below generally accepted standards.  [*See*

10

R. 732 at 89, 101, 112.]  Accordingly, the preponderance of the evidence supports a finding that each of the Defendants was a member of the conspiracy.

C

Throughout trial, the Defendants' objections to the admission of co-conspirator statements were based on the lack of evidence supporting the existence of the conspiracy and the Defendants' membership therein.  Their objections were generally not based on an argument that particular statements were not made in furtherance of the conspiracy.  This is understandable.  The Defendants never conceded that a conspiracy existed, so it was unnecessary to claim that a statement was in furtherance of it.

Nor did the Defendants argue that any particular statements were not made in furtherance of the conspiracy at the close of the Government's proof.  After the Government rested and the Court held a hearing on the *Enright* finding, the Defendants chose not to bring to the Court's attention any statement that was not in furtherance of the conspiracy.  [*See generally* Tr.] Rather, they asked the Court to determine whether the conspiracy existed and the Defendants were members.  *Id.*  Because the Defendants identified no particular statements not made in furtherance of the conspiracy, there was no argument before the Court on this final element.  Consequently, the Court need not address each of the individual co-conspirator statements *sua sponte* to determine whether they were made in furtherance of the conspiracy.

With that said, in general, the co-conspirator statements regarded management of the conspiratorial conduct at EHC.  "A statement is made in furtherance of a conspiracy if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy." *United States v. Martinez*, 430 F.3d 317, 327 (6th Cir. 2005) (quoting *United States v. Carter*, 14 F.3d 1150, 1155 (6th Cir. 1994)).  A statement that "prompt[s] a coconspirator to act in a matter

11

that facilitates the carrying out of the conspiracy" is made in furtherance of the conspiracy. *Id.* (citing *United States v. Monus*, 128 F.3d 376, 392 (6th Cir.1997); *United States v. Blakey*, 960 F.2d 996, 998 (6th Cir.1992)). Examples include statements "made to apprise a coconspirator of the progress of the conspiracy, to induce his continued participation, or to allay his fears. *Id.* (quoting *United States v. Rios*, 842 F.2d 868, 874 (6th Cir. 1988)).

The co-conspirator communications regularly prompted co-conspirators to act, updated them about the conspiracy's progress, and allayed their fears. For example, Lori Barnett's texts with office manager Linda Hatmaker discussed managing employees, handling patient prescriptions, and responding to issues with patients. [Gov. Ex. 736.] And her texts with Amanda Lay, another EHC employee, regarded scheduling patients and communicating with pharmacists. [Gov. Ex. 748.] These conversations furthered the conspiracy at EHC because scheduling and managing patients and employees and communicating about prescriptions was necessary for the scheme to issue unlawful prescriptions to operate. The Court finds that the co-conspirator statements were made in furtherance of the conspiracy.

The Government argues that even if a statement was not in furtherance of the conspiracy, many co-conspirator statements were "not hearsay at all." [R. 725 at 10.] If so, their admissibility would not hinge on Rule 801(d)(2)(E). *Id.* Again, it is impossible to reach this argument without specifically identified statements, so the Court does not reach the issue of alternative grounds for admission.

## III

Taken together, the Government put forth sufficient evidence for the Court to find, by a preponderance of the evidence, "(1) that the conspiracy existed; (2) that the defendant was a member of the conspiracy; and (3) that the co-conspirators statements were made in furtherance

12

of the conspiracy." *Wilson*, 168 F.3d at 920.  Accordingly, as stated in the Court's ruling from the bench, the Defendants' motions to exclude are **DENIED** and the Government's motion for *Enright* finding is **GRANTED**.

This the 9th day of August, 2023.

Gregory F. Van Tatenhove
United States District Judge